# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MILAN DEDIOL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 08-4256** |
| **BEST CHEVROLET and** | **SECTION: "C" (1)** |
| **DONALD CLAY** | |

## ORDER AND REASONS[1]

Before this Court is a motion for Summary Judgment by defendants Best Chevrolet, Inc. ("Best Chevrolet") and Donald Clay ("Clay"). Plaintiff Milan Dediol ("Dediol") opposes the Motion. The Motion is before the Court on the briefs, without oral argument. After reviewing the memoranda of the parties, the record in the case, and the applicable law, the Court GRANTS the Motion for the following reasons.

## I.  Background

Milan Dediol was employed as a used car salesman at Best Chevrolet from June 1, 2007 until August 30, 2007. (Rec. Doc. 19-3 at 1). Dediol worked directly under Donald Clay, the Used Car Manager, for the duration of his employment. (Rec. Doc. 5 at 2). Dediol filed a complaint with the EEOC immediately after resigning his employment, and he received his Right-To-Sue letter from the EEOC on July 8, 2008. (Rec. Doc. 1 at 1; Rec. Doc. 19-6 at 7). The Court has jurisdiction pursuant to 28 U.S.C. § 1343.

According to the undisputed facts, Dediol was 65 years old while he was employed for Best Chevrolet and is also a Born-Again Christian. (Rec. Doc. 19-3 at 1; Rec. Doc 20-1 at 1). Dediol claims he had no problems working with Clay until after

---

[1]Jordan Parker, a Second-Year student at Tulane University Law School, assisted in the preparation of this Order and Reasons.

July 4, 2007, when Dediol requested part of the holiday off to work a church event. Although Dediol received permission to attend from Clay's Assistant Manager, Tommy Melady ("Melady"), Clay overruled Melady's decision and made Dediol work on July 4. After this event, Dediol claims that Clay's attitude toward him became increasingly derogatory and threatening until Dediol's resignation.

Dediol alleges that Clay subjected him to pervasive supervisory harassment based on his age and religion. Per Dediol's briefing, Clay would refer to the plaintiff as "old mother f***er," "old man," "pops," et cetera about a half-dozen times per day. In addition, Clay would on occasion tell Dediol to "go to his God and [God] would save his job;" that "God would not put food on his plate;" and to "Go to his f***ing God and see if he can save your job." (Rec. Doc. 19-3 at 2). Clay would also frequently try to provoke a fight with Dediol. (Rec. Doc. 19-5 at 4; Rec. Doc. 19-7 at 7).

Dediol also alleges that he repeatedly complained to his superiors about the harassment, but they took no actions to discipline Clay. Almost all of the harassment occurred in front of Melady. In addition, Dediol repeated the offending language to the acting General Manager (and New Car Manager) John Oliver ("Oliver") when Dediol requested a transfer to get away from Clay. (Rec. Doc. 19-7 at 5). When Clay learned of this request, he denied Dediol's transfer while exclaiming "Get your old f***ing ass over here. You are not going to work with the new cars." (Rec. Doc 19-5 at 5).

According to the defendants, the tension between Dediol and Clay reached a boiling point at a morning office meeting on August 29, 2007. During an increasingly volatile exchange, Clay suddenly exclaimed, "I am going to beat the 'F' out of you," and allegedly charged toward Dediol in the presence of nine to ten employees. (Rec. Doc.

19-3 at 2; 19-6 at 3).  Despite this incident, Dediol continued working that day and the next day.  However, allegedly Dediol subsequently concluded that he could no longer safely return to work because of the August 29 incident.  (Rec. Doc. 19-7 at 4).  When Dediol resigned his position, Dediol said in a meeting with the managers, "I cannot work under these conditions—you are good people, but I cannot work under these conditions. It's getting too much for me."  (Rec. Doc. 19-7 at 5-6).  In response, Melady told him, "Milan, [Clay] will not touch you.  Do not worry about it."  (Rec. Doc. 19-5 at 4). Despite Melady's assurances, Dediol resigned his job without giving Best Chevrolet prior notice, and was subsequently terminated for job abandonment.  (Rec. Doc. 19-8 at 3, 12).

Dediol brings three claims before the court: 1) Age Harassment; 2) Religious Harassment and Constructive Discharge; 3) Assault by Donald Clay on August 29, 2007. (Rec. Doc. 1 at 2).  The claims of age and religious harassment are brought pursuant to the American Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act of 1964, respectively.[2]

Defendants allege that Clay's behavior towards Dediol is not actionable under either Title VII or ADEA, and Dediol's charges must be dismissed for failure to state a claim upon which relief can be granted.  (Rec. Doc. 5 at 2).  Defendants challenge Dediol's characterization of a hostile work environment by highlighting the various Best Chevrolet salesmen and managers who aided Dediol when he became homeless and had to live out of his car.  Defendants cite numerous acts of kindness to support their contention, including an employee lending Dediol money without asking Dediol to pay

---

[2]Dediol's Complaint does not cite a statute through which he brings his claims, but case law indicates that Title VII and ADEA are the applicable statutes that govern his claims of religious harassment and age harassment in the workplace, respectively.

him back, Assistant Manager Melady allowing Dediol to use the company shower, and General Manager Oliver loaning Dediol $300. (Rec. Doc. 19-7 at 6). Defendants assert that the conditions at Best Chevrolet do not amount to constructive discharge because they were not so intolerable as would compel a reasonable employee to resign, nor was Clay's behavior specifically tailored to induce Dediol's resignation. Furthermore, Defendants assert that Dediol's deposition undermines his assault claim because Dediol testified that he was not afraid at the time of the alleged assault, that he was not frightened enough to go home immediately after the incident, and he felt comfortable working on August 29, 2007, and the next day. In addition, two desks separated Clay and Dediol, and two people stood in front of Clay to block his advances—making it physically impossible for Clay to commit a battery against Dediol. (Rec. Doc. 19 at 4).

## II. Law and Analysis

### a. Standard of Review

Summary judgment is only proper when the record indicates that there is not a "genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A genuine issue of fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party (i.e. Dediol). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48. When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Herrera v. Millsap*, 862 F.2d 1157, 1159 (5th Cir. 1989).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record]

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle* Lake, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

      b. *Claims against Best Chevrolet*

Dediol makes two claims against Best Chevrolet: (1) Donald Clay created a hostile work environment by subjecting Dediol to pervasive supervisory harassment based on his age; (2) Donald Clay created a hostile work environment by subjecting Dediol to pervasive supervisory harassment based on his religion, in which Dediol was constructively discharged because of this harassment. (Rec. Doc. 1). As the employer of both Donald Clay and Dediol during the applicable period, Dediol seeks to hold Best Chevrolet liable for Clay's alleged Title VII and ADEA violations.

      <u>i. Age Harassment</u>

The criteria for a prima facie claim of a hostile work environment under the Age Discrimination in Employment Act (ADEA) are: (1) the employee is 40 years old or older; (2) employee was subjected to harassment, either through words or actions, based on his age; (3) harassment had effect of unreasonably interfering with employee's work performance and creating objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on part of employer. *Crawford*

*v. Medina General Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996).[3]

Dediol was 65 years old during his employment period, and thus satisfies the first element of a prima facie claim. (Rec. Doc. 19-3 at 1). For the second element, Dediol cites various incidents of age-related insults from his supervisor. Clay called Dediol "old scum," "old mother f***er" and "pops" around a half-dozen times per day, and Dediol alleges that Clay never used the plaintiff's real name after July 4, 2007. (Rec. Doc. 19-7 at 7; Rec. Doc 20-1 at 4). Almost all of the alleged harassment was witnessed by Clay's Assistant Manager, Tommy Melady. (Rec. Doc. 19-7 at 5). Thus, Dediol satisfies the second element.

For the third element, a workplace environment is hostile when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Fifth Circuit has held that in order for harassment to be sufficiently severe or pervasive, the conduct complained of "must be both objectively and subjectively offensive" such that the victim both perceives the environment as hostile *and* that a reasonable person would find it to be hostile or abusive. *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007). To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it

[3]The Fifth Circuit has never held that ADEA contemplates hostile work environment claims. When presented with the issue, the Fifth Circuit has repeatedly dismissed the hostile environment claim without addressing the applicability of hostile work environment under ADEA. This Court will assume, *arguendo*; that ADEA does contemplate hostile work environment claims, and will apply the Sixth Circuit standards as such. *See Mitchell v. Snow*, 326 Fed. Appx. 852, 854 n.2 (5th Cir. 2009); *McNealy v. Emerson Elec. Co.*, 121 F. App'x 29, 34 n.1 (5th Cir. 2005).

is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. *Id*. *(*citing *Harris,* 510 U.S. at 23). No single factor is determinative. *Id.* However, not all harassment–including "simple teasing, offhand comments, and isolated incidents (unless extremely serious)"–will affect a "term, condition, or privilege of employment." *Alaniz*, 591 F.3d at 771. (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).

Assuming that a hostile work environment can be based on age-related comments, the pervasity of the comments needs to be considered. In *Farpella-Crosby v. Horizon Health Care*, the Fifth Circuit concluded that an employee who endured sexual comments two to three times per week from a supervisor for six months was sufficiently pervasive to create a hostile work environment. 97 F.3d 803, 806-08 (5th Cir. 1996). Plaintiff's supervisor, Jose Blanco, made repeated comments that he "knew what she liked to do" in reference to Farpella-Crosby's alleged sexual appetite on account of having seven children, joked to a group of employees that Farpella-Crosby "doesn't know how to use condoms," and he frequently inquired about Farpella-Crosby's sexual activity. *Id.* at 805. Furthermore, Farpella-Crosby testified that the comments were so frequent that she could not remember each instance, and that Blanco threatened the plaintiff with her job on numerous occasions when she asked him to stop making the comments. *Id.* In the present case, according to the plaintiff, Clay subjected Dediol to age-related insults around a half-dozen times per day from July 4 until Dediol's resignation nearly two months later. Similar to the supervisor in *Farpella-Crosby*, Clay frequently threatened to fire Dediol in addition to frequently insulting him. Because two

to three insults per week for six months in *Farpella-Crosby* is a comparable number of incidences to the half-dozen insults per day for nearly two months in the present case, a reasonable jury could conclude that Clay's insults occurred with sufficient frequency.[4]

However, a jury could not reasonably find that Clay's remarks rise to the requisite level of severity. Defendants cite in their Motion for Summary Judgment the case of *Moody v. United States Secy. Of the Army*, in which the Fifth Circuit found that a supervisor did not create a hostile work environment when he referred to the elderly plaintiff as "granny," "old woman," and suggested she retire so a younger person could take her job. 72 Fed. Appx. 235, 238-39 (5th Cir. 2003). The Fifth Circuit reasoned that while these comments were "offensive and boorish," they were insufficiently severe to be actionable. *See id.* at 239. Similarly, Clay referred to Dediol as "old man" and "pops" and "old mother f***er." (Rec. Doc. 19-6 at 5). While the first two phrases are analogous to "granny" and "old woman," the third phrase "old mother f***er" is certainly more offensive. However, the Fifth Circuit has held that name-calling "which engenders offensive feelings in an employee" does not automatically violate federal discrimination laws. *See Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971). Thus, Clay's insults are insufficiently severe, in and of themselves.

Alternatively, Clay had a history of being short-tempered with Dediol. Dediol alleges that Clay threatened to beat him up every day. (Rec. Doc. 19-5 at 4). On several occasions Clay yelled at Dediol, "Get out of the office," and then ran toward him. One

---

[4]The Fifth Circuit has held that in the same manner that a single incident of harassment, if sufficiently severe, could give rise to a viable hostile work environment claim; a "continuous pattern of much less severe incidents of harassment" can create an actionable claim. *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 400 (5th Cir. 2007).

8

time in the lot, Clay allegedly threatened to kick Dediol with his foot. When Dediol put a freshly delivered pizza on Clay's desk, Clay yelled at Dediol, "Who told you to put that stuff on my desk?" and "Get that f***ing s**t of [sic] my desk" and started running towards him. (Rec. Doc. 19-7 at 7).

Despite these instances; however, Dediol fails to provide sufficient evidence that Clay's outbursts were motivated by age-related animus. Dediol testified in his deposition that he had "no idea" whether Clay did not like working with people over 60 years old. (Rec. Doc. 19-6 at 6-7). Dediol testified that he had "no idea" why Clay would threaten to beat him up or why Clay behaved in such a confrontational manner, unable to link his supervisor's conduct to any particular age-based prejudice. (Rec. Doc. 19-6 at 2, 9). When asked how the pizza incident supported the allegation that Clay's actions were based on Dediol's age, he replied, "I have no idea, sir." (Rec. Doc. 19-6 at 12).

Dediol's own conflicting testimony undermines his assertion that Clay's treatment had sufficient impact on Dediol's work performance to rise to the level of an actionable employment claim. For example, Dediol claimed that he was ahead of other salesmen for his Labor Day quota on August 29. (Rec. Doc. 19-7 at 7). However, Dediol also claims that his sales went down in June-August because Clay was allegedly steering sales to younger salespersons.[5] (Rec. Doc. 19-7 at 4). In the only example cited, Dediol was about to sell a car when the car's battery died. The customer left for 15 minutes to get cash, while Dediol informed Clay of the impending sale and worked to replace the dead battery before the customer returned. In response, Clay told Dediol to,

---

[5]The Fifth Circuit has held that while "lost sales as a result of the alleged harassment is certainly relevant to [a] hostile work environment claim," incidences of lost sales or a lack thereof are not, "by [themselves], dispositive." *E.E.O.C. v. WC&M Enterprises, Inc.* 496 F.3d 393, 400 (5th Cir. 2007)

"Get out of here."  Clay then called Peyton–another salesman/former manager, and friend of Clay's–to finish the sale.  Afterwards, Peyton shared half the commission with Dediol, who then thanked Peyton for the payment.  (Rec. Doc. 19-6 at 13-15).

While this incident may be, in the words of Dediol, "very unprofessional," Dediol does not provide sufficient evidence that this incident was based on his age.  (Rec. Doc. 19-6 at 15).  When asked why Clay would be steering customers elsewhere, Dediol replied, "I don't know why" and "He is the manager.  He can do anything he wants to do."  (Rec. Doc. 19-6 at 5).  As to why Dediol never complained to other managers about this alleged customer steering, he conceded, "The managers are the ones who decide what to do with the deal."  In addition, Dediol also conceded that in his prior experience selling used cars that splitting deals were common.  (Rec. Doc. 19-6 at 17).  Finally, Dediol did not provide any evidence of other concrete incidences of deal steering by Clay.  (Rec. Doc. 19-6 at 18).  Thus, Dediol lacks evidence to support his claim that Clay was steering deals to younger employees, or that his sales went down because of age discrimination, nor has he established that this one instance of deal-sharing was the result of age discrimination.

Dediol cited this alleged steering incident as one of the main reasons he sought transfer to the new car department.  When Clay learned of Dediol's intentions, he denied the transfer while exclaiming to the plaintiff, "Get your old f***ing ass over here.  You are not going to work with the new cars."  (Rec. Doc. 19-5 at 5).  The Fifth Circuit has held that the denial of a transfer may be the objective equivalent to the denial of a promotion—and qualify as an adverse employment action subject to relief under anti-discrimination laws—if the transfer entails an increase in compensation, provides greater

responsibility, creates greater opportunities for career advancement; or is otherwise objectively more prestigious. *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007). However, the Fifth Circuit also held that "neither the employee's subjective impressions as to the desirability of the new position nor the employee's idiosyncratic reasons for preferring the new position are sufficient to render the position a promotion." *Id.*

While Clay's behavior may appear uncivil and perhaps even capricious at times, the decision to deny Dediol's transfer to the new car department does not constitute an actionable employment claim. Dediol gives no indication that his responsibilities as a new car salesmen would greatly differ from his current position, or that the transfer would entail an increase in compensation or prestige. Rather, Dediol's principal reason for the transfer was "so that I could be away from Donald Clay" and work under different managers. (Rec. Doc. 19-5 at 6). A party's subjective desire for one position over another—which would not require a material change in the employee's duties, salary, benefits, or working hours—does not constitute an adverse employment action. *Alvarado*, 492 F.3d at 614. Because Dediol wanted to transfer only for his personal preference—and not a raise or promotion—Clay's denial of a transfer does not constitute an actionable employment claim under ADEA.

Weighing the totality of circumstances, Dediol does not have sufficient evidence to claim a hostile work environment based on age harassment. As a matter of law, federal employment discrimination laws are not intended to serve as a "civility code" in the workplace or to "prohibit all verbal or physical harassment in the workplace." *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 77 (1998). Rather, only

palpable discrimination based on a particular attribute like race, age, or religion is actionable. *See id.* While certainly being called "old mother f***er" and "pops" is neither flattering nor professional, the mere utterance of an offensive epithet "which engenders offensive feelings in an employee" does not automatically create an actionable harassment or discrimination claim. *See Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971). Thus, Dediol lacks evidence for a prima facie case for age harassment. As a result, this Court need not address the issue of Best Chevrolet's vicarious liability.

Thus, the Court grants the defendant Best Chevrolet's motion for summary judgment on the claim of age harassment.

ii.  Religious Harassment and Constructive Discharge

1.  Religious Harassment

Dediol alleges that Best Chevrolet is liable under Title VII of the Civil Rights Act of 1964 for the severe supervisory religious harassment caused by Donald Clay. (Rec. Doc. 1). Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). The phrase "terms, conditions, or privileges of employment" includes requiring people to work in a discriminatorily hostile or abusive environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal citations and quotation marks omitted). To restate the hostile work environment

standard, courts examine the totality of circumstances like "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Dediol cites a series of incidents he believes demonstrates Clay's animus against Dediol's religion. Dediol has been a Born-Again Christian since 2006. (Rec. Doc. 19-6 at 10). Two weeks prior to the July 4, 2007, Dediol asked Assistant Manager Melady for permission to come into work around 1-2 p.m. on July 4 so he could work a church event called "Feed the Multitudes," which Melady subsequently granted. However, the night before the Fourth of July, Clay told Dediol "You old M.F., you are not going tomorrow," and "If you go over there, I'm going to fire your f***ing ass." (Rec. Doc. 19-5 at 9). When Dediol pleaded to Melady–who, as Assistant Manager, is Clay's subordinate—Melady replied, "Well, he is the boss, Milan." While Dediol came to work on July 4 between 7:30 and 8:00 a.m., everyone else arrived at 10:00 or 11:00 a.m. That day, Clay put his shoes on Dediol's desk and said, "Do you see these shoes? Your God did not buy me these shoes. I bought these shoes," to which Dediol replied, "Okay," and did not press the matter further. (Rec. Doc. 19-5 at 9).

Dediol credits the Fourth of July as the date when Clay began to ridicule Dediol with age- and religion-based insults, and when Clay became regularly confrontational and physically threatening toward Dediol. One morning, Dediol told Clay that he was a Christian and asked Clay if he was too. When Dediol offered Clay a chance to "start again," Clay reportedly retorted, "get the f**k out of the office." (Rec. Doc. 19-6 at 6). Dediol cited another incident when he was reading his bible his office. Before seeing the

bible, Clay told Dediol to, "Get your ass out on the floor." After Dediol told Clay he was

reading his bible, Clay told him, "Get outside and catch a customer. I don't have

anybody in the lot. Go get outside." Dediol testified that it was his duty to go outside

and how he "loved to go catch the customers." (Rec. Doc. 19-5 at 11-12). On the date of

Clay's alleged assault on August 29, 2007; Clay exclaimed, "You can go to your God

and let him save your job," prior to charging toward Dediol. (Rec. Doc. 19-5 at 10).

Dediol claims that Clay's mention of "God" was his breaking point, and thereafter Dediol

believed he was protected by God and was not afraid at the moment Clay charged toward

him. (Rec. Doc. 19-5 at 11).

Dediol's evidence is insufficient to show a prima facie case of religious

harassment. Clay's denial of time off for the Fourth of July does not constitute a Title

VII violation. Employers are required to make "reasonable accommodations" to the

religious observances of an employee—such as working on religious holidays—so long

as the accommodations can be made without undue hardship on the conduct of the

employer's business. 41 C.F.R. § 60-50.3 (2010). However, the Fourth of July is not a

religious holiday, and does not require the employer to make specific accommodations

for the employee. Furthermore, all other employees were required to work that day, and

Dediol was not unfairly singled out to work. Regarding Dediol's complaint of coming in

earlier than other workers, that does not constitute a Title VII violation. An employer is

free to set its employees' hours under Title VII, provided that particular protected group

members are not treated unfairly or disproportionately affected. *2 Emp. Discrim. Coord.*

*Analysis of Federal Law § 49A:5*. Dediol provides no evidence that Clay's decision to

have him come to work a few hours earlier than other employees on one occasion was

motivated by religious animus.  Furthermore, given that Dediol had only been employed by Best Chevrolet for just over one month on July 4, 2007; it is objectively reasonable—and certainly within Clay's authority—that Dediol's relative newcomer status with the dealership would justify Clay requiring him to start earlier than other employees, and that such a decision was not motivated any particular religious animus.

With respect to comments like "God did not buy me these shoes" and "You can go to your God and let him save your job," such statements alone—though perhaps uncivil—do not sufficiently alter Dediol's terms and conditions of employment to constitute an actionable claim.  The Fifth Circuit has held that "Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment."  *Scales v. Slater*, 181 F.3d 703, 712 (5th Cir. 1999).  Because Dediol cannot link religious animus to any particular adverse employment decision, Clay's religious comments are just stray remarks.  In addition, when Clay told Dediol to go to the lot and "catch customers," he first made the request before he confirmed that Dediol was reading a bible.  Clay was merely telling Dediol to do his job, not harassing Dediol for practicing his religious beliefs.  Thus, Clay telling Dediol to "catch customers" does not constitute a Title VII violation.

Under the totality of circumstances, Dediol fails to provide sufficient evidence that he suffered any actionable religious harassment. While Dediol alleged that Clay began treating him differently after the Fourth of July incident, Dediol could not answer definitively why that was the case.  Dediol's uncertainty as to whether his religion motivated Clay's behavior shows that the conduct was not so pervasive as to definitively establish that Clay's actions stemmed from religious prejudice against Dediol.  When

asked why Clay threatened to beat up the plaintiff often, Dediol replied "I don't know why" and "I have no idea." (Rec. Doc. 19-6 at 2). When asked why Clay repeatedly threatened to fire him, Dediol answered that he had no particular explanation. When asked if Clay does not like working with Born-Again Christians, Dediol replied, "I really don't know." (Rec. Doc. 19-6 at 6). Thus, Dediol's own testimony indicates that he could not expressly link Clay's behavior to any particular religious animus. As a result, Dediol does not have a prima facie case for religious harassment under Title VII.

The Court grants the defendant Best Chevrolet's motion for summary judgment on the claim of religious harassment.

## 2. Constructive Discharge

With regard to the claim of religious harassment, in order to prove a constructive discharge, Dediol must show that "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). The test for constructive discharge is objective, in which the question is not whether Milan Dediol personally felt compelled to resign, but whether a reasonable employee in his situation would have felt so compelled under the circumstances. *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 772 (5th Cir. 2001). However, the Fifth Circuit has held that a constructive discharge claim requires a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (quoting *Landsgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992)). Because Dediol's religious harassment claim fails, Dediol's constructive discharge claim based on religious harassment should also fail.

16

However, even if Dediol were to have an actionable claim of religious harassment, his claim of constructive discharge would likely still fail. The factors that the Fifth Circuit has considered to determine a constructive discharge include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer *calculated to encourage the employee's resignation*; or (7) offers of early retirement...

*Brown v. Kinney Shoe Corp.*, 237 F.3d at 566 (Emphasis added).

Based on these factors, Dediol has failed to present sufficient evidence that a reasonable person in his position would have felt compelled to resign. In his deposition, Dediol testified that he was never demoted, never received a reduction in salary, never changed his job responsibilities, and had no recollection of being assigned to degrading work. (Rec. Doc. 19-6 at 19-21). When asked if Clay was trying to force Dediol to quit or to retire early, Dediol responded "I don't know. I don't think" and "I have no idea," respectively. (Rec. Doc. 19-6 at 21-22). Although Clay had a tendency for combative behavior, Dediol's testimony casts doubt as to whether Clay's conduct was "calculated to encourage the employee's resignation." *Brown*, 237 F.3d at 566. Furthermore, Dediol's denial of transfer to the new car department does not create an actionable claim because "constructive discharge cannot be based upon the employee's subjective preference for one position over another." *Hunt*, 277 F.3d at 772 (quoting *Jurgens v. Equal Employment Opportunity Comm'n*, 903 F.2d 386, 391 (5th Cir.1990)). Thus, because Dediol effectively testified that none of these seven factors existed at Best Chevrolet, he has failed to show a reasonable person would have felt compelled to resign.

In addition, Dediol's failure to exhaust Best Chevrolet's internal grievance procedures suggests that his work environment was not so intolerable as would compel a

reasonable person to resign.  An employee "who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged."  *Baker v. John Morrell & Co.*, 382 F.3d 816, 829 (8th Cir. 2004) (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995).  Although Dediol often complained of Clay's treatment, Dediol admitted that he left Best Chevrolet without first pursuing Best Chevrolet's internal grievance procedures.  (Rec. Doc. 19-8 at 1, 7).  Dediol also quit Best Chevrolet without first filing an EEOC complaint, only filing the complaint after his resignation.  (Rec. Doc. 19-8 at 1, 7).  Thus, while Dediol frequently complained to his managers about Clay's behavior—and even tried to transfer to another department just to get away from him—Dediol never filed an official complaint against Clay prior to resigning.  As a result, Dediol quit before exhausting internal administrative remedies.  Thus, work conditions at Best Chevrolet were not so intolerable that would make resignation the only viable option for a reasonable employee.

Despite Dediol's frequent clashes with Clay, courts have held that personality conflicts at work that generate antipathy and hostility between supervisors and co-workers are not actionable under Title VII.  *See Burlington Northern & Santa Fe. Ry. v. White*, 548 U.S. 53, 66 (2006).  In addition, being subject to a rude and demanding boss is not sufficient to constitute a violation of Title VII.  *Duhé v. United States Postal Serv.*, No. 03-746, 2004 WL 439890, *10 (E.D. La. 2004).  Furthermore, discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge.  *Id.*  Thus, Clay's pattern of uncivil and at times bellicose behavior towards Dediol—including Clay's threats to fire Dediol without reason—is insufficient to constitute constructive discharge.  Ultimately, Dediol's dislike of one particular manager

is not sufficient grounds to support a claim of constructive discharge.

Thus, the Court grants the defendant Best Chevrolet's motion for summary judgment regarding Dediol's constructive discharge claim.

### c. *Claims against Donald Clay in his Individual Capacity*

#### i. Age and religious harassment

Dediol sues Clay in his individual capacity for violations under Title VII and the ADEA, not as an employee of Best Chevrolet. (Rec. Doc. 5 at 1). These claims fail because of Dediol's failure to state a claim upon which relief can be granted. Dediol cannot recover against Clay in his individual capacity under Title VII; "[O]nly 'employers,' not individuals acting in their individual capacity who do not otherwise meet the definition of 'employers,' can be liable under [T]itle VII." *Johnson v. TCB Const. Co., Inc.*, 334 Fed. Appx. 666, 669 (5th Cir. 2009) (citing *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir. 1994). In addition, the ADEA "provides no basis for individual liability for supervisory employees." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 686 (5th Cir. 2001).

#### ii. Jurisdiction of State Law Assault Claim

Dediol filed his complaint in this Court pursuant to 28 U.S.C. §1343. As the Court has dismissed Dediol's federal civil rights claims, and there is no diversity of citizenship among the parties,[6] there are no more federal claims before the district court. This Court must then "exercise its discretion whether to exercise jurisdiction over [the plaintiff's] state law claims." U.S.C. § 1367(c)(3) ("The district courts may decline to

---

[6]In Defendants' Answer and Affirmative Defenses, Defendants assert a lack of a diversity between the parties as required by 28 U.S.C. § 1332. (Rec. Doc. 5 at 6). Dediol does not allege jurisdiction pursuant to 28 U.S.C. § 1332, nor does he refute the Defendants' affirmative defense. Thus, this Court finds no diversity of citizenship.

exercise supplemental jurisdiction over a claim under subsection(a) if . . .(3) the district court has dismissed all claims over which it has original jurisdiction"); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims, but without prejudice so the plaintiff may refile his claims in the appropriate state court. *Bass*, 180 F.3d at 246.

With all of Dediol's federal claims dismissed, the Court exercises its discretion to dismiss *without* prejudice Dediol's assault claim for lack of subject-matter jurisdiction.

Accordingly,

IT IS ORDERED that Defendants' motion for summary judgment is GRANTED on the claims of age harassment and religious harassment/constructive discharge; and Plaintiff's state law assault claim is subsequently DISMISSED without prejudice.[7]

New Orleans, Louisiana, this 20th day of July, 2010.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**

---

[7]Nothing in this Order and Reasons should be construed as a ruling on the merits of any assault claim.